August 1999 saw the culmination of a confrontation over the differing views of Townsend and Malla regarding how concrete or abstract the Affiliates Committe on Consortium Membership's future plans had to be, particularly with respect to recruitment of new affiliates in industry. Townsend personally replaced Malla as chair of the committee.[9] Later that month, Malla wrote Regina Smith with a copy to Defendant Smith proposing that the leadership of the Connecticut Space Grant Consortium be shifted from Townsend and the University of Hartford to UConn.[10]

Deterioration in the relationship continued up to and after Malla's removal, culminating (at least in the summary judgment record) in September of 2000 with Townsend asking Regina Smith to remove Malla from any position of responsibility following Malla's aggressive message to Townsend informing her that it was "highly unreasonable and inappropriate of you to ask me to

---

Electronic Mail of Malla to Townsend (copied to Regina Smith) dated July 28, 1999 at 1.

[9] See e.g., Electronic Mail of Townsend to Malla (forwarded to Regina Smith) dated August 10, 1999 ("Due to unresolvable differences as to the direction of the affiliates committee, I am replacing you immediately as chair. This decision is irrevocable."); Electronic Mail of Malla to Townsend (forwarded to Regina Smith) dated August 10, 1999 ("I am responding to your e-mail message of August 05 (appended below). I strongly disagree that the Committee on Consortium Membership is 'off-task.' ... Clearly, the strategic plan, as you seem to indicate now, is outside [the Committee's] scope. ... Any constructive comments ... will be greatly valued....").

[10] See e.g., Electronic Mail of Malla to Regina Smith (copied to Robert Smith) dated August 25, 1999 ("Bringing a new director aboard in most likelyhood (sic) will not fix the problems when there are serious underlining issues accumulated for so many years. I strongly believe that we need a strong new leadership for the Consortium.... And that is in my mind ... [UConn]. ... As a matter of fact, I still have to see any sign of new vision and injection of new enthusiasm (in action) from the new director.").

16

n/a

contact/visit Dan Civco's office to fetch the compendium.... Isn't it your responsibility that each of the Thrust Coordinators get a copy of the compendium? ... (That means interrupt my work, face inconvenience and spend 30-40 minutes of time to just fetch the compendium)." Electronic Mail of Malla to Townsend (forwarded to Regina Smith) dated September 1, 2000.[11]

Also included in Regina Smith's affidavit as material reviewed prior to Malla's removal are Townsend's notes from a September 9, 1999 meeting between Malla, Townsend, and Granstrand. The notes characterize the meeting as "somewhat heated" and memorialize "several directives" given to Malla by Townsend, including "never again refer[ing] to Laurie or me as his secretary...." and "ceas[ing] going behind [Townsend's] back in coup attempts or any other negative activity."

Finally, defendants point to Malla's deposition testimony that he received regular raises in pay since becoming tenured, that he was appointed an associate professor and associate department head in 1998, and that he had the support of UConn and Maryanski in recruiting other institutions in Connecticut for membership in the Consortium, all as showing the absence of

---

[11] In an attempt to quell the compendium dust up, Civco sent a reply to Malla, stating, "Come on now. I had e-mailed you last week that I had three copies of the compendium, and asked that you send someone over to 'fetch' it, as you put it, if you couldn't make it yourself. Well, Ed managed to come to receive his copy. And since you hadn't come as of yesterday morning, I personally delivered your copy to your office after my class ended at 10:00 and before a 10:30 appointment ... it took me only 15 minutes for the round trip between Young and Castleman." Electronic Mail of Civco to Malla (forwarded to Regina Smith) dated approximately September 1, 2000.

17

discriminatory motive. Defendants' proffered evidence, if believed, would certainly permit the conclusion that Malla was removed for non-discriminatory reasons.

### C. Malla's Rebutting Evidence

Malla must now "come forward with evidence that the defendant's proffered, non-discriminatory reason is a mere pretext for actual discrimination." Weinstock, 224 F.3d at 42. Malla may satisfy this burden with evidence sufficient to establish "... a prima facie case, combined with sufficient evidence to find the employer's asserted justification is false...." Reeves, 530 U.S. at 148; see also Zimmerman v. Associates First Capital Corp., 251 F.3d 376, 381 (2d Cir. 2001) ("Reeves instructed that the combination of evidence establishing a prima facie case and evidence showing that a proffered explanation was pretextual is neither always to be deemed sufficient nor always to be deemed insufficient."). Even with such evidence, however, "an employer is [nonetheless] entitled to judgment as a matter of law if the record conclusively reveal[s] some other, nondiscriminatory reason for the employer's decision, or if the plaintiff create[s] only a weak issue of fact as to whether the employer's reason was untrue and there [is] abundant and uncontroverted independent evidence that no discrimination had occurred." Reeves, 530 U.S. at 148.

18

Despite Malla's voluminous opposition, the Court concludes that no reasonable jury could find from it that defendants' proffered grounds for removal were a pretext for discrimination. The evidentiary submissions of defendants, particularly those attached to Regina Smith's affidavit, provide abundant and uncontroverted evidence that no discrimination occurred, namely that UConn removed Malla because of his perceived inability (regardless of fault) to work with Townsend, the individual in charge of Connecticut's Space Grant program and correspondingly the EPSCOR grant. While the Court has considered all of the proffered evidence and argument, the following discussion does not respond to every detail of plaintiff's opposition but addresses only the most cogent arguments and supporting evidence.

### 1.   Townsend's Letter of December 13, 1999

Malla's analysis of how a jury could reasonably conclude that no investigation or only a sham investigation was conducted is not supported by the 103 page excerpt of Townsend's deposition testimony provided by plaintiff. See Townsend Depo. (03/13/2003) 7:7-109:2 & 122:18-123:1; Opp'n [Doc. #38] at 8. It does not support the inference plaintiff asks to be drawn, that Townsend could not "substantiate the veracity of the allegations [of the December 13, 1999 letter]," Opp'n [Doc. #38] at 9, and therefore Regina Smith did not conduct an investigation because she could

19

not have verified Townsend's allegations. While Townsend during the deposition, which was taken in 2003, often testified that she did not remember events, conversations, or other matters that had occurred in 1999-2000, she provided in detail the factual foundation undergirding the statements in the December 13, 1999 letter, including where an investigator could look for further information, if necessary. See e.g., Townsend Depo. (03/13/2003) at 19:11-13;[12] 37:6-15;[13] 38:5-39:13;[14] 44:5-15;[15] 47:16-48:8;[16]

---

[12] Q. That particular e-mail falls into your definition of broadcase e-mail?
A. Absolutely.

[13] Q. Let's take it one at a time. Do you have any written evidence to support your contentions in the bullets?
A. I'm not sure. Perhaps Laurie has some.
Q. Okay. When you say you're not sure, are you not sure of the form of the written evidence?
A. I don't think I have any written evidence. I don't know what Laurie has. Some of this came from Laurie, some of it was my personal experience.

[14] Q. Who did it go to, specifically?
A. Well, as indicated in the bullets at the bottom of the page, there was a student that had reported negative activity. David Atkinson reported to Laurie Granstrand about negative activity. We got complaints, at least one complaint from Judy Donnelly at Three Rivers College, who was badly treated as a token member of EPSCOR, bullet 3. Bullet No. 4 had to do with EPSCOR management.
Q. Did you receive these complaints directly?
A. I received them. Laurie Granstrand received the three I just mentioned: The student, Dave Atkinson called her to complain about behavior out of Johnson Space Flight Center, this is what she told me; and then I believe it was Judy Donnelly - - I believe that's the name, that's easy to check - - talked to Laurie about how she was treated.
Q. That's your letter; is that correct?
A. That's correct. But I trust Laurie completely. I never found her to lie or in any way to mislead me. We were a team managing this. But as director, I wrote the letter; my signature is on it.

[15] Q. Did you specifically hear this token statement?
A. The token statement was made to Laurie Granstrand.
Q. Okay. The token statement was made to Laurie Granstrand from Ramesh Malla?
A. From the person to whom he made the statement about being a token,

20

78:7-79:20;[17] see also id. e.g., 90:13-92:3; 97:22-99:21; 115:2-23[18].[19]  Thus, any suggestion that Townsend's lack of personal

---

the Three Rivers participant in his program, who I believe was Judy Donnelly. I'm not sure of the name. That's why I say believe. I would have to look it up.

[16]
Q. Ramesh constantly opposed you?
A. Consistently.
Q. Consistently?
A. Yes.
Q. Let me ask you how he consistently opposed you?
A. For instance, he was - - on April 8th of '99, NASA came up to have a meeting with the consortium to talk about how we could make the consortium better. The result of that was three task forces to look into issues. Ramesh volunteered to be in charge of the one to deal with the affiliate discussion. I kept giving them guidelines of what I was looking for. What came back was how they were going to turn it into a democracy. When you're fiscally responsible for a grant, you can't have a demoncracy.
Q. That was the way he opposed you?
A. That was one of the ways. And I can point to documentation if you look at the three drafts.

[17]
Q. Now, the second sentence on the letter dated 12/13/99, in paragraph 3, you used the term 'petty issues,' correct?
A. That's correct.
Q. Okay. Now, can you define what - - can you tell me what these petty issues were?
A. Specifically, I remember one, and that was he called them to ask for a title.
Q. Called to ask for a - -
A. Title.
Q. T-I-T-L-E?
A. That's correct.
...
Q. Well, how did you find out that he was seeking this title?
A. I got a voice mail telling me he was seeking a title, a voice mail from - - I don't remember if it was Julius or Diane, one of the two.

[18]
Q. Can you tell us who collaborated or assisted you in drafting the December 13, 1999, letter which is marked as Exhibit 3?
A. Yes. Vin Greenan and Laurie read through it, being the space grant office. Betty Ivey had me include a sentence, Betty then being the provost of the university. My dean, Alan Hadad, had been with the program from the beginning; I'm sure I gave it to him to read before I sent it out. I did not do this willy-nilly. I went through the channels. The dean saw it, the provost saw it and corrected a piece, and Laurie and Vin. I saw an e-mail from Laurie when I was reviewing that said they looked through it and they made corrections.
...
Q. Is there anything in [the December 13, 1999 letter] as you look at

21

knowledge by itself with respect to some items in the letter would preclude investigation into the accuracy of the letter's contents lacks evidentiary support.

Plaintiff also attempts to artificially set the December 13, 1999 letter as some kind of investigatory cutoff, asking the inference to be drawn that, absent consideration of events occurring before that date, Regina Smith's inquiry into Malla's relationships with Townsend and NASA could not have supported removing Malla for poor working relationships and thus such inquiry must have been a sham. There is no basis for such an artificial cabining of Regina Smith's investigation. Regina Smith's affidavit (undisputed in this regard) states that her investigation included review of all electronic mails attached to her affidavit, many of which predate December 13, 1999 and demonstrate that she was intimately knowledgeable about the relationship between Malla and Townsend at least as of early July 1999, fully five months prior to Townsend's December 13, 1999 letter. See Regina Smith Aff. [Doc. #37] ¶ 10-11, Ex. A.

---

        it today that's untruthful?
A.    No.

[19] Plaintiff appears to insinuate that a jury could also find the allegations in the December 13, 1999 letter from Townsend to Maryanski baseless because Townsend "has not responded to a request to produce copies of broadcast e-mails..., [a]nd Townsend failed to adequately identify witnesses, although lawful (sic) requested to do so." Opp'n [Doc. #38] at 8. The supporting parts of Townsend's deposition testimony, Townsend's responses to interrogatories, and follow up letters submitted by plaintiff demonstrate only that plaintiff requested information, Townsend divulged and turned over some of the requested information, and Townsend agreed to look for more information and turn it over, if found. Plaintiff has never made any motion to compel or otherwise indicated that compliance with discovery obligations was wanting.

Indeed, Malla often contemporaneously forwarded correspondence from this time period to Regina Smith. See id. Ex. A. Thus, while a jury could conclude reasonably that Townsend's letter of December 13, 1999, triggered Regina Smith's formal inquiry, a reasonable jury could not conclude that her investigation solely looked into the allegations of Townsend's letter and therefore that Malla's removal was based solely on those allegations. See Defendant Smith Depo. (03/24/2003) at 25:25-26:12;[20] see also id. at 53:4-15;[21] Maryanski Depo. (03/18/2003) at 12:8-13; 76:19-25.

Similarly, plaintiff places great significance on the fact that Regina Smith provided the names of the three replacement applicants suggested in Townsend's December 13, 1999 letter, asking the inference to be drawn that Regina Smith was inputting into Malla's removal before any investigation had even begun. Such reliance is misplaced as it relies on the same artificial

---

[20] Q. ... What led to this letter dated April 14, 2000 was the letter dated December 13, 1999 marked as Plaintiff's Exhibit 3?
A. Not entirely, Mark, because I testified that the letter just triggered a whole series of conversations and fact-finding by Gina and some information that she was gathering from the University of Hartford and passing that on to me. So the picture that emerged over a few months' time seemed to confirm the allegations that Sallie Townsend made in her letter of December 13th.
Q. The fact-finding of Regina Smith?
A. Yes.

[21] Q. And when you saw these allegations raised in [Townsend's December 13, 1999 letter]..., did you give plaintiff an opportunity to rebut the allegations raised in that letter?
A. I, again, Mark, as I mentioned earlier, delegated responsibility to Gina Smith to follow up and find out what the problems were, what difficulties there were and whether there could be any kind of remediation if there were problems. And she reported to me on a number of occasions that the allegations in the letter were correct.

23

dichotomy between the pre and post December 13, 1999 status of UConn's knowledge, which cannot be maintained in light of the overwhelming abundant and uncontroverted record evidence revealing Regina Smith's and UConn's knowledge about Malla's serious interaction problems with Townsend and NASA long before December 13, 1999. See e.g., Regina Smith Aff [Doc. #37] Ex. A.; Robert Smith Depo. (03/24/2003) at 69:9-12.[22] Townsend was asked by UConn to make her complaints formal by putting them in writing, see e.g. Townsend Depo. (03/13/2003) at 114:18-24,[23] and, prior to writing the letter, Townsend sought input from Regina Smith regarding who would be a suitable replacement for Malla, in response to which Regina Smith provided the names of individuals who were familiar working with NASA grants.

Finally, even if a jury credited Malla's testimony that the allegations in Townsend's letter of December 13, 1999 were untrue and thereby discredited defendants' claim of having verified the accuracy of Townsend's statements, such conclusion would not demonstrate the falsity of defendants' stated reason for removal, problems with working relationships. Even if the problems in the

---

[22] A. Again, the [December 13, 1999 letter] was not a great revelation to us. We had been hearing concerns, and that was really one of the first times we had gotten something formally in writing.

[23] Q. Okay. In terms of the letter itself, you said that UConn requested it?
A. Yes.
Q. Could you tell us who at UConn requested the letter dated December 13, 1999?
A. I don't remember. Maybe Bob Smith. He was Gina's boss. May have been Fred [Maryanski].

24

working relationship could have been traced to Townsend and were not the product of Malla's conduct, the stated basis for removal, friction and contention with the statewide Director of the Consortium, would still be true.

### 2.  Procedural Deficiencies in Malla's Removal

Malla also attempts to show that Regina Smith's investigation was a sham (or non-existent) by pointing to what plaintiff characterizes as a "mode of operation ... not consistent with good business practice and more consistent with concealing a secret[,] ... discrimination." Opp'n [Doc. #38] at 11. While UConn's methodology in going about Malla's removal may not have included the creation of a written report with attached substantiating evidence that was shared with Malla and formal opportunity to rebut all the evidence set forth therein, in the absence of some evidence demonstrating that such methodology was required by UConn's own disciplinary policies and procedures, none of this evidence casts doubt on UConn's stated reasons for removal.

### 3.  Nature of Problem with Townsend

Plaintiff also proffers an argument that is difficult to understand but appears to be that Malla's difficulties with Townsend were professional and not personal and that therefore "a

25

reasonable jury could find that UConn breached the trust owed to Plaintiff because UConn wanted to give the Campus director position to Dr. Civco." See Opp'n [Doc. #38] at 13-14. What is problematic about Malla's argument is that almost all of the evidence cited in support substantiates the existence of a substantial amount of friction between Malla and Townsend, including Malla's deposition admission that he knew Townsend was not happy with him. Even though Malla characterizes the discord as a professional and not personal problem, his evidence supports defendants' proffered explanation that Malla's poor working relationship with the head of the Consortium and EPSCOR program required change in UConn's Campus Director position.

### 4. Conclusion

A complete review of all evidence offered by plaintiff does not support the inference that UConn's stated reason for removing Malla from his position as campus director was false. As set forth above, overwhelming and undisputed evidence in the record establishes that Malla and Townsend could not work together, that NASA personnel confirmed Malla's working relationship problems, and that, as a result, UConn decided to make a change. Nothing provides a basis for rational jurors to conclude that UConn did not make the change because of poor working relationships, and nothing suggests that the change was made because of race, color,

26

or national origin.  Accordingly, UConn is entitled to summary judgment on Count One of Malla's second amended complaint.

## IV.  Due Process Violation

It is well established that "the Fourteenth Amendment's Due Process Clause requires ... (1) determin[ation of] whether the claimant has a property interest, [and] then (2) determin[ation of] whether []he received adequate process before being deprived of that interest."  <u>Harhay v. Town of Ellington Bd. of Educ.</u>, 323 F.3d 206, 212 (2d Cir. 2003).  Maryanski and Smith argue they are entitled to summary judgment on Malla's due process claim under both prongs.  They claim: 1) Malla was not deprived of a property right protected under the Fourteenth Amendment as a result of removal from the position of Campus Director of the Consortium; and 2) In the alternative, even if Malla had a constitutionally protected property interest in the position, any process due was satisfied by the procedures available to Malla under the AAUP's collective bargaining agreement with UConn, of which UConn asserts he failed to take advantage, meetings with Regina Smith during the Fall of 1999, the meeting with Regina Smith and defendant Smith on March 31, 2000, and the meeting on June 2, 2000 with Regina Smith, defendant Smith, defendant Maryanski, Dr. Erling Murtha-Smith, Head of department of Engineering, AAUP Executive Director Ed Marth, and Assistant Vice-Chancellor

Virginia Miller.

A.  **Federally Protected Property Right**

Maryanski and Defendant Smith argue that Malla had no federally protected property right in his position as Campus Director of the Consortium so that a decision to remove him did not entitle him to any due process, including a pre or post deprivation hearing.  Defendants contrast Malla's position as a tenured faculty member of UConn, which they point out is created and defined by the university's laws, by-laws and rules of the board of trustees, with Malla's position as Campus Director of the Consortium from 1991 to 2000, which they argue has no independent source creating and defining it under state law. Therefore, they conclude Malla has no claim of entitlement to the position and it does not constitute protected property under the Fourteenth Amendment under Board of Regents of State Colleges v. Roth, 408 U.S. 564 (1972) and Ezekwo v. New York City Health and Hosp. Corp., 940 F.2d 775 (2d Cir. 1991).  In support, Maryanski states: "I am not aware of any University By-Law, policy, regulation or contract in connection with the appointment or designation of Campus Director of the Connecticut Space Grant College Consortium at the University of Connecticut."  Maryanski Aff. [Doc. #36] ¶ 7.

Malla argues that the source of his entitlement to the

28

position of Campus Director arises from an implied provision of a contract with UConn (presumably for his position as a tenured professor) that was created by the course of dealing between UConn and him. Malla relies on Ezekwo, 940 F.2d 775. For evidentiary support, plaintiff points to his service as Campus Director from 1991 to 2000, his own expectation that he would remain Campus Director for as long as there was a Space Grant Consortium, see Malla Depo. (03/14/2003) at 26:10-15, and the defendants' acknowledged power of appointing and removing individuals from the position of Campus Director. See Robert Smith Depo. (03/24/2003) at 39:16-23;[24] 41:22-42:6.[25] Malla also claims that he received $2,500 per year for serving as campus director and that the position was not subject to annual review, but does not submit the corresponding deposition testimony to which he cites for both propositions.[26] Although not pointed to by Malla as evidence supporting a finding of a constitutionally

---

[24] "I believe there are some documents that document this relationship between the University of Connecticut and the Space Grant Consortium and the University of Hartford, and I believe in those documents, it indicates that the person serving in that vice provost role has the authority to appoint and to terminate an appointment of a person in the role that Dr. Malla had."

[25] "My understanding is that the appointing authority for this position was through the office that I served. I also had a directive from Fred Maryanski to investigate this matter, and if, in fact, it was my finding that Dr. Malla was not a suitable continuing coordinator, that I was to essentially take this kind of action. So I derived some authority as well from the chancellor of the University."

[26] See Opp'n [Doc. #38] at 19 (citing Robert Smith Depo. (03/24/2003) at 51:14-52:12 but not submitting corresponding pages in attached Exhibit 3; and citing Malla Depo. (03/14/2003) at 27:19-28:16 and 127:9-16 but not submitting corresponding pages in attached Exhibit 8).

29

protected property right, the record contains testimony from Malla's deposition in which he states that UConn has a custom pursuant to which the writer of a grant is entitled to be the lead principal investigator on it if received, Malla was the writer and recipient of the original grant for the Consortium at UConn, the president of UConn signed the original grant application in which it was stated that Malla would be the principal investigator at UConn, and the Dean of Engineering included a letter in the original grant application to the same effect. See Malla Depo. (03/14/2003) at 21:4-26:15. UConn does not dispute Malla's deposition testimony.

On these facts, if proved, the Court believes that, under controlling Second Circuit law,[27] Malla had a federally protected property right in his position as Campus Director for UConn of the Consortium. "Property interests are not created by the Constitution; rather 'they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law-rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.'" Ciambrello v. County of Nassau, 292 F.3d 307, 313 (2d Cir. 2002)(quoting Bd. of Regents of State Colls. v. Roth, 408 U.S. 564, 577 (1972)). "[T]hat property can take many

---

[27] The Supreme Court has left open the question of whether discipline of tenured public employees short of termination is afforded protection under the Due Process Clause. See Gilbert v. Homar, 520 U.S. 924, 929 (1997).