forms ... [and] '[a] person's interest in a benefit is a 'property' interest for due process purposes if there are such rules or mutually explicit understandings that support his claim of entitlement to the benefit and that he may invoke at a hearing.'" Ezekwo, 940 F.2d at 782 (quoting Perry v. Sindermann, 408 U.S. 593, 601 (1972)). A claim of entitlement is not precluded by absence of a formal right memorialized in an individual contract or a collective bargaining agreement because "not every term of a contract must be reduced to writing[, and] [a]dditional contractual provisions may be implied into a contract as a result of a course of dealing between the parties. [Thus,] [t]he parties through their conduct and practice can create additional rights and duties." Id. (quotation omitted). While "not every contractual benefit rises to the level of a constitutionally protected property interest," id., UConn's "policies and practices ... were such that an entitlement to the position of [Campus Director] existed," id. at 783.

In Ezekwo, the Second Circuit concluded Dr. Ifeoma Ezekwo had a property interest under state law and the Constitution in her expectation of becoming Chief Resident in the third year of her opthalmology residency program at Harlem Hospital Center ("HHC"), where HHC adopted a policy and practice of awarding the position of Chief Resident to all third year residents on a rotating basis, the policy was expressly highlighted in HHC's

31

informational documents, Ezekwo's expectation was enhanced when she was verbally advised in June 1987 that she would obtain the position beginning in November of the same year, the position included a salary increase, Ezekwo relied on HHC's course of conduct, and a member of the medical profession would have considered the designation of Chief Resident of special importance because it denotes culmination of years of study and can only be occupied once. See id. "Accordingly, [the Second Circuit agreed] with the district court that Ezekwo's expectation of performing the duties of Chief Resident was reasonable and well founded and rose to the level of a property interest entitled to protections afforded by the Due Process Clause." Id.

The Court thinks Malla's interest in the Campus Director position is at least as strong as Ezekwo's was in the Chief Resident one. Malla had already occupied the position for nine years. He had spearheaded UConn's response to the call from NASA for grant applications. The application explicitly identified Malla as the lead investigator should the grant be funded, the president of UConn signed the application, and the Dean of Engineering submitted a letter stating that Malla would be the lead investigator if the grant was awarded. Malla stated in deposition testimony, unrebutted by UConn, that UConn follows a custom and practice pursuant to which the grant writer is entitled to the lead role if the grant is awarded. Further, the

Court does not think it speculation to conclude that, analogous to Ezekwo, there is special importance in the academic community to being the lead writer, recipient, and investigator on a grant, and to holding that position for the duration of the grant, which in the present case was for nine years. Support for this proposition can be found in a letter written by Dr. Erling Murtha-Smith, Head of the Department of Civil and Environmental Engineering, on behalf of Malla to Maryanski. The letter is dated June 12, 2000 and was written after Dr. Murtha-Smith attended Malla's June 2, 2000 meeting with university officials. It reads in pertinent part,

> Professor Malla was an original PI on the Space Grant proposal and as PI "owns" a substantial part of that proposal and the continued award. In addition, it is my understanding that Professor Malla put together the EPSCOR investigator team at UConn and from many of the other participating institutions. Further, it is my understanding that he also developed or compiled most of the narrative of the proposal. Thus, his intellectual property in this proposal includes not only his own technical contribution, but also his selection, invitation, and assembly of the team of investigators without whom there would be no proposal. This ownership of a substantial part of the Space Grant Consortium proposal and awards and the EPSCOR proposals and awards cannot be taken from him.

See Murtha-Smith Mem. (06/12/2000) at 1-2. Accordingly, having found that plaintiff has raised a genuine issue of material fact on factual questions underlying the conclusion that he had a constitutionally protected property interest, the Court moves to a consideration of the process afforded Malla prior to his removal.

33

### B. Process Provided or Available to Malla

#### 1. Parties' Arguments[28]

Maryanski and Smith also argue that Malla received all process he was due. Here, defendants point to Malla's allegedly having failed to "utilize the procedures available to him under the Collective Bargaining Agreement[,... and thus conclude] plaintiff cannot allege he has been deprived of his due process rights under the Fourteenth Amendment without first exhausting the remedies available to him under the CBA." Mem. in Supp. of S. J. [Doc. #33] at 17. For evidentiary support, defendants point to article 10 of Malla's collective bargaining agreement, asserting "the CBA afforded the Plaintiff the right to a *de novo* appeal and, as a part of that process, a full evidentiary hearing [and] [t]hereafter, the Plaintiff had the right to pursue arbitration," Mem. in Supp. of S. J. [Doc. #33] at 19; see also Maryanski Aff. [Doc. #36] Ex. C, Malla's deposition testimony that, although he wrote to his AAUP on several occasions requesting a formal grievance, he did not remember whether one had been filed, see Malla Depo. (03/14/2003) at 34:14-35:1, and Maryanski's affidavit testimony that Malla did not file a formal grievance under AAUP collective bargaining agreement over his

---

[28] Although defendants' brief formally divides procedure available under Malla's collective bargaining agreement with that provided by meetings with university officials, all such evidence speaks to the second prong of a due process analysis. See e.g., Narumanchi v. Board of Trustees of Connecticut State Univ., 850 F.2d 70, 72 (2d Cir. 1988).

34

removal, see Maryanski Aff. [Doc. #36] ¶ 13.

Defendants argue that "the review of the University of Connecticut in combination with the review and remedies available pursuant to the CBA grievance/arbitration procedure, fully satisfies the requirements of due process." Mem. in Supp. of S. J. [Doc. #33] at 21. Defendants point to interactions, including meetings, electronic mail, and telephone conversations, between Regina Smith and Malla during the Fall of 1999 addressing issues related to Malla's working relationship with Townsend and others in the Consortium, see Regina Smith Aff. [Doc. #37] ¶ 11 and Ex. A, Malla's meeting with Regina Smith and Robert Smith on March 31, 2000, at which defendants represent Malla was provided "the reasons supporting the decision to remove him as Campus Director, an explanation and presentation of the information supporting the decision to remove him, and an opportunity to respond to the information and present his position," id. ¶ 12; Robert Smith Aff. [Doc. #35] ¶ 12, and Malla's post removal meeting of June 2, 2000 with university officials and AAUP Executive Director Ed Marth, at which defendants say Malla was provided with the same explanation, information, and "yet another opportunity to address the issues of interpersonal difficulties within the Space Grant Consortium." Mem. in Supp. of S. J. [Doc. #33] at 19; see Regina Smith Aff. [Doc. #37] ¶ 12; Robert Smith Aff. [Doc. #35] ¶ 12; Maryanski Aff. [Doc. #36] ¶ 11.

Malla makes a two-pronged challenge to consideration of the availability of process under the collective bargaining agreement to which he is subject.  First, Malla challenges the applicability of the agreement to his removal from his position as Campus Director.  He points to his post-removal use of the agreement's "open communication provision," Opp'n [Doc. #38] at 20, which, by its terms, covers "problems," see Maryanski Aff. [Doc. #36] Ex. C ¶10.1.[29]  Pursuant to that provision, Malla's AAUP representative Edward Marth requested a meeting with, among others, Maryanski, "to review what information was used in the decision to remove Prof. Malla from his position with the space consortium," Electronic Mail of Edward Marth (05/04/2000), noting that he "was under the impression that [Malla] was not given a chance to review the facts, which may well be in dispute, about why the change was made," id.  Maryanski agreed to the meeting the following day conditioned on Regina Smith's attendance and all parties being represented.  See Electronic Mail of Fred Maryanski (05/05/2000).  The meeting requested by Marth is the June 2, 2000 meeting between Malla and university officials. Malla thus contrasts his use of the open communication provision

---

[29] The full section reads as follows:

"The parties agree that all problems should be resolved whenever possible before the filing of a grievance and encourage open communication between administrators and members, so that the formal grievance procedure will not normally be necessary."

See Maryanski Aff. [Doc. #36] Ex. C ¶ 10.1.

36

with the availability of the procedure under the collective bargaining agreement available for formal grievances, which are defined as "dispute[s] concerning the interpretation or application of the terms or provision of the agreement," see Maryanski Aff. [Doc. 36] Ex. C ¶ 10.2, and points out Smith and Maryanski's failure to identify in their moving papers any term or provision of the agreement pursuant to which Malla's removal would constitute a grievance under the agreement giving rise to the detailed procedural protections available under it for grievances.

Second, Malla argues that any process otherwise available to him in the collective bargaining agreement is not legally relevant to the due process calculation because, under the terms of the agreement, Malla's use of such procedure is "permissive," Opp'n [Doc. #38] at 20, and does not require exhaustion, id. at 21. Malla points to Article 10.3 of the agreement:

> Request to Other Procedure. If prior to seeking resolution of a dispute by filing a grievance under this contract, or while the grievance proceeding is in progress, a member seeks to resolve the matter in any other forum, whether administrative or judicial, the Board shall have no obligation to entertain or proceed with this grievance procedure.

See Maryanski Aff. [Doc. #36] Ex. C ¶ 10.3. Malla essentially concludes that, if the Court forces him to exhaust any grievance procedure previously available to him in the collective bargaining agreement, he will effectively have no claim because

any such grievance would now be out of time. See Opp'n [Doc. #38] at 21.

Malla tells a different tale about his meetings with Regina Smith and defendants. With respect to the sole pre-removal meeting of March 31, 2000, Malla states he was not told about the subject matter of the meeting beforehand, see Malla Depo. (03/14/2003) at 31:1-12, was asked to resign his position as Campus Director but not told he would be removed if he refused to do so, see Malla Aff. ¶ 9, 11, was told that the resignation was requested "because of a letter received from the Provost of the University of Hartford ... claiming difficulty in communications with Sallie S. Townsend," id. at 11, was not informed of any investigation or review, see id., was not provided with a copy of the referenced letter, see id., and was not referred to or presented any other evidence other than the letter, see id.; see also Malla Depo. (03/14/2003) at 34:1-3. He says the first time he received a copy of Townsend's letter was June 5, 2000, see id. ¶ 18, and that he was not interviewed about the allegations in Townsend's letter, see id. ¶ 19. A memorandum dated June 12, 2000 and written by Erling Murtha-Smith, Head of the Department of Civil and Environmental Engineering, to Maryanski expresses serious concerns regarding the manner in which Malla was removed from his position as Campus Director:

> ... As I have detailed in previous memos, I reiterate that your administration did *not* follow due process in regard to

38

> the removal of Professor Malla as Campus Director for the
> Space Grant Consortium. He was not informed what the
> substance was for the removal, and he was not and has not
> been given an opportunity to respond to any allegations.
> Your administration has chosen to accept the "allegations"
> of the Townsend December 13, 2000 letter as truth and just
> cause, without offering Professor Malla any opportunity to
> rebut.
>
> The package of emails and letters handed over by VP
> Smith at the June 2nd meeting did not substantiate the case
> for removal. ...none of the emails in the package
> substantiates the allegations in the Townsend letter.
>
> It is my understanding that the first time Professor
> Malla has seen the Townsend letter and its allegations was
> at the recent June 2nd meeting. That was just ten days ago
> but over 5 months *after* the date of the letter, two months
> after VP Smith's meeting with Professor Malla asking him to
> step down, and over a month since the removal of Professor
> Malla from the position. Indeed, to the best of my
> knowledge, your administration failed to present the
> allegations at any time to Professor Malla before, at, or
> subsequent to the March 31, 2000 meeting with Robert Smith
> and Regina Smith, and the subsequent removal of Professor
> Malla as Campus Director of the Space Grant Consortium.
> Since Professor Malla had *not* seen or heard the allegations
> of the Townsend letter, he was not able to rebut any of the
> allegations in the three months between the probable receipt
> of the letter and the removal action. Further, he has not
> been in a position to rebut any of the allegations until
> after the June 2nd meeting. ...
>
> Meanwhile, following the March 31st, 2000 meeting,
> Professor Malla, myself and Dean Faghri had each
> independently asked for more information on the reasons for
> the action. None of us have received any information.

See Murtha-Smith Mem. (06/12/2000) at 2. Finally, contemporaneous and just subsequent to the March 31, 2000 meeting, Malla wrote defendant Smith, informing him that he would not step down and recalling, "You neither elaborated on [Townsend's and the Provost of University of Hartford] specific

39

concerns nor attempted to get my view points on the issues raised by them." Malla Electronic Mail (04/11/2000).

### 2. Discussion

From the above summary judgment record, the Court concludes that underlying factual disputes preclude granting summary judgment in favor of defendants Smith and Maryanski on Malla's due process claim. A public employee dismissable only for cause is entitled to a pre-termination hearing prior to being terminated as "'an initial check against mistaken decisions – essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action.'" Gilbert, 520 U.S. at 929 (quoting Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 545-46 (1985)). Such process "'need only include oral or written notice of the charges, an explanation of the employer's evidence, and an opportunity for the employee to tell his side of the story.'" Id. (quoting Loudermill, 470 U.S. at 546). However, "due process ... is not a technical conception with a fixed content unrelated to time, place and circumstances [but] is flexible and calls for such procedural protections as the particular situation demands," id. at 930 (quotations and citations omitted), and thus not every form of discipline of a public employee short of termination, for example, suspension or

removal from a particular position, necessarily triggers a due process requirement of a pre-deprivation hearing and opportunity to be heard. See e.g. id. at 930-935.

The determination of what process is due is analyzed under the well known three pronged balancing test of Mathews v. Eldridge, 424 U.S. 319, 335 (1976):

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probably value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest.

Defendants here do not analyze in a systematic manner the evidence under this test. With respect to the private interest, defendants press that, as a matter of law, Malla's position is not a federally protected property right. The Court disagreed with this contention above. It is, however, difficult from this record to determine exactly how significant is Malla's interest in the Campus Director position. Dr. Murtha-Smith's letter of June 12, 2000 considers Malla's interest in the grant at a very high level in light of Malla's status as principal drafter, generator, and investigator on the grant and his assemblage of the corresponding investigative team. Malla's electronic mail to defendant Smith dated April 12, 2000, further describes his lead role in the establishment of the Consortium. Thus, on the present record, a jury could conclude that Malla's interest in the Campus Director position in charge of the grant he himself

41

had obtained was quite significant in the academic community and the removal from this position correspondingly not an insignificant matter. Finally, analogous to terminations, the removal was a permanent decision of potentially indefinite duration, particularly where, as here, Malla was replaced shortly after his removal from this singular Campus Director position.

UConn has really made no attempt to demonstrate its interest, particularly as it regards removal of Malla without enhanced pre-deprivation procedures. UConn's interest in maintaining good working relationships with the individual in charge statewide of the Consortium may well be significant but a deeper factual record would be required to determine how significant. Weighing against concluding the existence of significant state interest in speedy action are two timing factors: First, UConn was aware of the problems between Townsend and Malla at least as of July 1999, but did not ultimately act to remove Malla until April 14, 2000. Time apparently was not of the essence. Second, Malla had held the Campus Director position for nine years and was the individual responsible for having created it. An additional couple of months may not have caused irreparable damage. Both the timing factors as well as Regina Smith's investigation demonstrate that this was not a sudden, unpredictable, or random deprivation requiring only post-removal remedies. See e.g., Ezekwo, 940 F.2d at 784.

The last <u>Mathews</u> factor, risk of erroneous deprivation and likely value of any additional procedures, weighs in favor of Malla. Malla's version of events, which must be accepted by the Court at summary judgment, as bolstered by the observations of Dean Murtha-Smith depict a pre-removal process by which Malla was provided orally the barest outline of the charges against him at an informal meeting to which he was invited without knowledge of the subject matter, was not told the consequence of refusing to resign, was not provided with any evidentiary supporting basis other than an oral representation (and how specific is unclear) about the allegations of Townsend's letter, and was not permitted at any time to offer evidence or attempt to rebut the specific allegations contained in the letter.

Crediting Malla's version of pre-removal events and Dr. Murtha-Smith's observations about the importance of Malla's interest in his position, coupled with UConn's seemingly low level interest in speedy removal of Malla, could support a conclusion that Malla was due greater pre-deprivation process than he was provided by defendants Smith and Maryanski. While, without the benefit of a full trial record, the Court cannot delineate the precise contours of exactly what process Malla was due, it is sufficient here to note that, under the <u>Mathews</u> balancing of the summary judgment record, he was due more than his version of events demonstrate he received.

43

Defendants predominantly rely on the post-removal procedures they say were available to Malla in the AAUP's collective bargaining agreement. This argument is unavailing. First, as Malla points out, defendants do not point the Court to any provision of the agreement pursuant to which Malla's removal would have qualified as a "grievance" as that term is defined in Article 10.2 of the agreement versus merely the "problem" of Article 10.1 such that Malla would be entitled to the procedural protections set forth therein. This is not an insignificant point because, at least at the step one grievance stage, it is the administration that decides whether the "problem" raised pursuant to Article 10.1's open communication meeting rises to the level of a "grievance" requiring the administration to notify the AAUP in writing of the terms of the settlement of the "problem." See Maryanski Aff. [Doc. #36] Ex. C 10.4A. Second, although the availability of post-deprivation procedures, even if timely (and here, the Court notes the six week gap between Malla's removal and the open communication meeting of June 2, 2000), can, under certain circumstances, excuse lack or absence of pre-deprivation procedure, the cases cited by defendants in support of Malla's collective bargaining agreement so applying in this case are distinguishable. For example, in Narumanchi, Judge Newman concluded that the pre-deprivation and hearing rights available in a tenured university professor's collective

bargaining agreement provided any process due under the facts of that case, notwithstanding the professor's failure to appear at his pre-suspension hearing, which happened after he received written warning of the offending conduct and the university's intent to suspend based on a violation of the collective bargaining agreement, and even after the re-scheduling of the intent to suspend hearing at the professor's request. See Narumanchi, 850 F.2d at 71-72. The facts of Narumanchi are plainly not analogous to the present summary judgment record.[30]

## IV. Conclusion

For the reasons set forth above, Defendant's Motion for Summary Judgment [Doc. #32] is GRANTED in PART with respect to Malla's Title VII claim, but DENIED in PART with respect to his due process claim.

IT IS SO ORDERED.

Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut: March 31st 2004.

---

[30] The Court notes, however, that Malla's characterization of the collective bargaining agreement as permissive and thus not requiring exhaustion of remedies evinces a misunderstanding of the nature of a due process claim. Due Process is concerned with what process is used or available to an individual both pre and post deprivation of constitutionally protected property, and thus process available under a collective bargaining agreement is one factor in the calculus of determining whether the individual received all process due. See Narumanchi, 850 F.2d at 72.

45